UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Clifford Steward, individually and on behalf of all similarly
situated persons,

                     Plaintiff,

              - against -

The City of New York, The New York City Board of
Education, Harold O. Levy, individually and in his official
capacity as Chancellor of the New York City Board of
Education, Felix E. Vazquez, individually and in his official
capacity as Community Superintendent of District 32 of the
New York City Board of Education, Mildred L. Boyce, The
United Federation of Teachers, and Pace University,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

04 CV 1508 (CBA)(RML)

# Memorandum of Law In Opposition to Defendants' Motion to Dismiss

Of Counsel:

Michael G. O'Neill

# Table of Contents

Table of Contents ........................................................................................................... 2

Authorities Cited ........................................................................................................... 3

Preliminary Statement ..................................................................................................... 4

Facts and Prior Proceedings .............................................................................................. 5

Argument ..................................................................................................................... 8
1.  Plaintiff Had A Constitutionally Protected Property Interest In
    His Continued Participation In The Teaching Fellows Program. ...................... 8
2.  Defendants Misinterpret the Law Regarding Post Deprivation
    Remedies ............................................................................................... 18
3.  Plaintiff's allegations against Levy are sufficient. ............................................ 20
4.  Defendants' Arguments regarding Supplemental Jurisdiction are
    mooted by the continued viability of his federal claims. .................................... 20

Conclusion .................................................................................................................. 21

# Authorities Cited

## Cases

*Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548

(1972) ............................................................................................................... 8, 9

*Brown v. Board of Educ.*, 42 A.D.2d 702 (2nd Dept. 1979) ............................................ 10

*Coleman v. Newburgh Enlarged City School District*, 319 F.Supp.2d 446 (S.D.N.Y.

2004) ................................................................................................................... 17

*Ezekwo v. New York City Health and Hospitals Corporation*, 940 F.2d 775 (2d Cir.

1991) ..................................................................................................................... 8

*Garcia v. State University Of New York Health Sciences Center At Brooklyn*, 2000 WL

1469551 (E.D.N.Y. 2000) .................................................................................... 17

*Hellenic American Neighborhood Action Committee v. New York*, 101 F.3d 877 (2d Cir.

1996) ................................................................................................................... 19

*Lehman v. Board Of Education*, 82 A.D.2d 832 (2nd Dept. 1981) ................................... 9

*Longarzo v. Anker*, 78 Misc.2d 977 (Sup. Kings 1974) ................................................. 9

*Schwartz v. Board of Education*, 536 N.Y.S.2d 500 (2nd Dept. 1989) ............................ 9

*Winnick v. Manning*, 460 F.2d 545 (2d Cir. 1972) ........................................................ 17

# Preliminary Statement

This case is the poster child for procedural due process. Plaintiff was enrolled in a program created by the New York City Board of Education (the "Board") known as the Teaching Fellows program. Under this program, the Board agreed to pay for plaintiff to obtain a Master's Degree in Education, in return for which plaintiff agreed to teach for three years in the New York Public Schools. This program was created pursuant to New York State Department of Education Regulations which permit qualified individuals to be certified as teachers on a transitional basis while they earn a master's degree. The same regulations require the school district to commit to employ the candidate for three years, and they establish very specific procedures and guidelines for individualized plans for supervision, observation and evaluation of these individuals, which are to be memorialized in written agreements signed by the school district, the educational institute, and the individual.

The Board and Pace violated the State Regulations almost from day one. The Board assigned plaintiff to teach classes outside his area of certification, and it never created the individualized plans for plaintiff's development as a teacher. Plaintiff was never given the mentoring, supervision or assistance required by the state regulations; instead, he was treated exactly in the same manner as teachers on the traditional path, i.e., who have already earned their master's degrees and who have served as student teachers. Plaintiff's performance was found lacking by his school administrators, and

the school principal terminated plaintiff's employment midway through the school year. As a result, plaintiff was automatically expelled from the Teaching Fellows program.

Although the actions of the school principal were in direct contravention of the State Regulations governing the Teaching Fellows program, plaintiff was given no opportunity, pre or post deprivation, to challenge her actions. His sole remedy was to pursue a grievance under the collective bargaining agreement between the Board and the United Federation of Teachers, which contained no provisions relating to Teaching Fellows and which did not provide any means of restoring plaintiff to the Teaching Fellows program. Indeed, nearly two full years passed from the date of plaintiff's termination until the scheduled arbitration.

As shown herein, plaintiff clearly had a property interest in his continued participation in the Teaching Fellows program. Plaintiff should have been given a pre-deprivation hearing at which he could have established that the school principal's proposed actions were in violation of State Regulations. Accordingly, plaintiff may maintain this action to remedy the Board's failure to provide any due process rights to him before stripping him of his participation in the Teaching Fellows program.

## Facts and Prior Proceedings

The New York City Teaching Fellows is a program designed to bring individuals from other walks of life into the teaching profession as a means of alleviating the shortage of certified teachers in the New York City public school system. The principal feature of the Teaching Fellows program is that the Board of Education

arranges and pays for a Master's Degree program, in return for which the Teaching Fellow agrees to teach in New York City schools for the duration of the program.

The program is built around regulations issued by the New York State Department of Education for certification of so-called "alternate route" teachers, meaning individuals who come to the teaching profession from other disciplines. Under these regulations, individuals enrolled in a qualified Master's Degree program are given a transitional teaching certificate. The regulations create a tripartite partnership between the individual, the educational institution, and the school district, which integrates the Master's Degree program with actual teaching for three years in order to qualify the candidate for a permanent teaching certification.[1]

Plaintiff was accepted into the Teaching Fellows program in May, 2001. Complaint, ¶15. He was enrolled in Pace University for his Master's Program, and began teaching at a middle school in Brooklyn. Id., ¶¶17-18.

Plaintiff should have been assigned to teach classes in his prospective certification, which was Social Studies. Instead, he was given computer related courses to teach. This was in violation of the regulations of the State Department of Education. Moreover, also in violation of the same regulations, plaintiff was subjected to the same observation and evaluation process as teachers on the traditional path. Plaintiff should have been observed and evaluated according to a plan agreed to by his University mentor and school personnel, which would have been individually tailored to take into

---

[1]     The Teaching Fellows program and the transitional certificate regulations apparently began as two year programs, but by the time plaintiff became enrolled had become a three year program. Some of the public literature describing the program and/or the regulations refer to it as a two year program.

his account his teaching experience and the advice of his academic mentor. Id., ¶¶19-23.

Not surprisingly, plaintiff's initial observations were not successful. This and hostility from school administrators resulted in plaintiff being removed from the class in January, 2002 and terminated as a teacher. Id., ¶28. After less than four months, plaintiff's career as a teaching fellow was abruptly ended by a school principal who simply ignored the New York State Department of Education Regulations applicable to plaintiff's employment.

Plaintiff attempted to make use of the grievance and arbitration procedures contained in the collective bargaining agreement between the UTF and the Board of Education. Plaintiff pursued these remedies from January, 2002 until December, 2003, at which time an arbitration on his grievance was scheduled. Plaintiff, however, was informed by his union representatives that the only relief that the Arbitrator was able to give under the contract was to award plaintiff the remainder of his salary for the 2001-02 academic year, and that in no event would he be reinstated in the Teaching Fellows program. This was because the collective bargaining agreement contained no provisions applicable to Teaching Fellows, and plaintiff's case would be subject to the rules applicable to teachers on the traditional path, who have already obtained their master's degree and who already qualified for state certification. Id., ¶¶29-41.

Unlike teachers on the traditional path, without a master's degree in Education and without certification, plaintiff's hope for a career as a teacher was ended, whether

he won or lost the arbitration.[2] Realizing that the arbitration provided no remedy whatsoever, plaintiff withdrew from the process and elected to pursue his rights in court. Id., ¶41.

# Argument

### 1. *Plaintiff Had A Constitutionally Protected Property Interest In His Continued Participation In The Teaching Fellows Program.*

Plaintiff agrees that a probationary employee in New York State *ordinarily* has no constitutionally protected property interest in continued employment. The reason for this is simple. Procedural due process safeguards come into play only when an employee has a legitimate expectation of continued employment, which must be derived from something other than the employee's unilateral "abstract need or desire." *Ezekwo v. New York City Health and Hospitals Corporation*, 940 F.2d 775 (2d Cir. 1991). New York Education Law §2573 provides in pertinent part that "the service of a person appointed to any of such positions [i.e., a probationary employee] may be discontinued at any time during such probationary period, on the recommendation of the superintendent of schools, by a majority vote of the board of education." This language provides no basis for a "legitimate claim of entitlement to it" [continued employment]. *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The New York Courts, however, have repeatedly held that other statutes, rules, regulations and Board of Education By-Laws can impose limitations on the termination

---

[2]    Teachers on the traditional path who are terminated during their probation are nonetheless eligible to teach in other schools -- their careers are not ended in the same manner as plaintiff's.

of probationary teachers. In *Lehman v. Board Of Education*, 82 A.D.2d 832 (2nd Dept. 1981), a "special circular" promulgated by the Chancellor of the Board of Education, designed to "clarify the administrative and supervisory roles of both district and bureau personnel," was held to create legally enforceable rights concerning the termination of probationary teachers. Similarly, in *Longarzo v. Anker*, 78 Misc.2d 977 (Sup. Kings 1974), the court held that the failure to abide by the Board of Education bylaws in providing an unsatisfactory rating to a probationary teacher violated the teacher's constitutional due process rights (citing *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

Thus, the effect of Education Law §2573 on this case is simply neutral. Nothing in that statute provides any basis for a probationary teacher to form a "legitimate expectation" of continued employment. By the same token, nothing in that statute prevents the Board of Education from voluntarily adopting restrictions on the manner or reason for terminating probationary teachers. The most clear illustration of this last point is in the collective bargaining agreement ("CBA") entered into between the Board of Education and the United Federation of Teachers. The New York Courts have consistently recognized the validity of limitations on the termination of probationary teachers contained in the CBA, even if they are limitations on the right to discontinue probationary teachers "at any time" contained in Education Law §2573. See, e.g., *Schwartz v. Board of Education*, 536 N.Y.S.2d 500, 501 (2nd Dept. 1989):

> A probationary teacher's right to a review of the Chancellor's decision to discontinue his or her services is neither constitutional nor statutory, but is contained in the collective bargaining agreement to which the respondents have promised to adhere (see, Matter of Frasier v. Board of Educ. of City School Dist. of N.Y., 71 N.Y.2d 763, 768, 530 N.Y.S.2d 79, 525 N.E.2d 725). The right is set forth in Section 5.3.4 of

9

the Board's by-laws and in Special Circular 45, 1974-75. The by-laws and the Special Circular are rules and regulations which are binding upon the Board and which the Board may not waive (see, Matter of Lehman v. Board of Educ. of City School Dist. of City of N.Y., 82 A.D.2d 832, 833, 439 N.Y.S.2d 670).

See also *Brown v. Board of Educ.*, 42 A.D.2d 702 (2nd Dept. 1979).

In this case, the State Department of Education Regulations were similarly binding on the Board of Education. In creating the Teaching Fellows Program and taking advantage of the transitional certificate offered by the regulations in question, the Board necessarily agreed to submit to those regulations as a matter of law. Moreover, since plaintiff alleges that he had a constitutionally protected property interest in his continued participation in the Teaching Fellows program, this Court must look beyond the employment itself and examine all of the facts and circumstances relating to the Teaching Fellows Program in order to determine the sufficiency of plaintiff's allegations.

Remarkably, nowhere in their moving papers do defendants provide any background or discussion of the Teaching Fellows program, nor do they explain how the Court can decide, in a legal and factual vacuum,[3] that plaintiff had no property interest in his continuing participation in that program  Defendants' motion should be denied for legal insufficiency on this ground alone.

Plaintiff's ability to present the Court with detailed documentary information about the Teaching Fellows Program is hindered by the fact that he does not have the same access to it as defendants, and he has not yet had the benefit of discovery.

[3]     It is worth noting that, at the pre-motion conference held with respect to defendants' motion, the Court made the very common-sensical proposition that the parties should engage in limited discovery concerning the teaching fellows Program in order to provide a sufficient factual background for determination of these issues, and defendants resisted that suggestion.

Nevertheless, even the information that is publicly available demonstrates beyond any doubt that plaintiff's expectations of continued participation in the Teaching Fellows Program were entirely legitimate and sufficient to give rise to a constitutionally protected property interest.

The Teaching Fellows program was first announced on April 26, 2000 and formally created in late May, 2000. http://www.nycenet.edu/secretary/calendar/03-21-01/calendar.htm. The April 26, 2000 announcement and the May, 2000 creation of the teaching fellows program are not publicly available, and plaintiff intends to seek them through discovery.

In implementing the Teaching Fellows Program, the Board of Education entered into contracts with a number of Universities in the metropolitan area to provide "approved alternate route teacher education programs." The Board referred to these Universities as its "partners" in the Teaching Fellows Program, and it entered into contracts with them for a wide variety of mandated services at a cost per Teaching Fellow of $12,000. By far the most significant feature of the contract between the Board of Education and the Universities was the full payment of the Teaching Fellows' tuition for a Master's Degree in Education.
http://www.nycenet.edu/secretary/calendar/05-16-01/calendar.htm#3.

The Teaching Fellows Program was required by law to comply with regulations of the New York State Department of Education relating to alternate routes to teacher certification. These regulations are published at 8 NYCRR 52.21 and 8 NYCRR 80-5.13. Copies of these regulations are annexed hereto as Appendices A and B, respectfully, for the Court's convenience.

11

Section 80-5.13 of the regulations describes the teaching certificate established by these regulations, called a "Transitional B Certificate." In order to receive a Transitional B Certificate, the certificate holder must meet three categories of requirements: (i) education; (ii) examination and (iii) employment. 80-5.13(a)(2).

The education requirement is three fold. The candidate must have at least a Bachelor's Degree from an accredited institution, he or she must have completed the introductory component of "an alternative teacher certification program" meeting the requirements of 52.21(b)(3)(xvii) of the regulations, and he or she must be enrolled in an "an alternative teacher certification program" leading to the conferment of a Master's Degree meeting the requirements of 52.21(b)(3)(xvii) of the regulations. 80-5.13(a)(2)(i).

The examination requirement is that the candidate must pass certain qualifying examinations. This requirement is not at issue in this case. 80-5.13(a)(2)(ii).

The employment requirement is that the candidate must "submit satisfactory evidence of having a commitment from a school or school district of employment as a full- time teacher with the school or school district in the area of the certificate sought for at least three school years, which shall include at least one year of mentoring as prescribed in section 52.21(b)(3)(xvii) of this Title." 80-5.13(a)(2)(iii).

Section 52.21(b)(3)(xvii) is relevant because it describes the requirements of the educational program in which Teaching Fellows must be enrolled, and because it describes the mentoring that the school district is required to give to the Teaching Fellows during the first year of employment.

12

The regulations require candidates to receive "mentoring and supervision during the entire period that they are both teaching and enrolled in the program . . .." Section 52.21(b)(3)(xvii)(b)(3)(ii). The regulations are extremely specific as to the nature of the mentoring and supervision. Before the candidate is to begin teaching, the educational institution (in this case Pace) and the employing school district (in this case the Board of Education) must execute a written agreement (the "First Mentoring Agreement") setting forth the following detailed provisions:

- The school district must consult with both the institution and the candidate before determining the teaching load of the candidate;

- The school district must agree to provide daily mentoring of the candidate by certified school personnel during the first eight weeks of teaching; and

- The school district must agree to execute, before the end of the first eight weeks of teaching, a second written agreement for continued mentoring by certified school personnel during the remainder of the time that the candidate is enrolled in the program and teaching.

Section 52.21(b)(3)(xvii)(b)(3)(ii)(B).

The First Mentoring Agreement must also provide that all mentoring will be provided by certified school personnel who have received preparation for their role as mentors prior to serving as mentors. Finally, the First Mentoring Agreement must also include scheduled times during the candidate's first eight weeks of teaching for the

candidate and mentor to engage in planning, observation, advisement, and evaluation. Section 52.21(b)(3)(xvii)(b)(3)(ii)(C).

As noted above, within the first eight weeks of teaching, the Board of Education is required to enter into a second written agreement (the "Second Mentoring Agreement") with the institution and the teacher. That agreement is to include a schedule for continued mentoring during the remainder of the time that the candidate is enrolled in the program and teaching and is to be designed to meet the individual learning needs of the candidate. Section 52.21(b)(3)(xvii)(b)(3)(ii)(D) The Second Mentoring Agreement must specify times, periodically throughout each school year, for the candidate and mentor to engage in planning, observation, advisement, and evaluation. It must also specify dates for meetings of program faculty, the school principal or designee, the mentor, and the candidate at least once every three months during the first year of mentored teaching and periodically thereafter, to provide the candidate with advice for improving teaching practices. *Id.*

The Second Mentoring Agreement can be modified only with the consent of both the institution and the teacher. Section 52.21(b)(3)(xvii)(b)(3)(ii)(E).

Several important observations can be made from the above facts. The Transitional B regulations (and hence the Teaching Fellows Program) clearly recognized that alternate route candidates needed different kinds of mentoring, observation and supervision than teachers following the traditional route to certification. As a result, the regulations mandated that the school district and educations institutions enter into formal, written contracts containing specific provisions relating to teaching load, intensive levels of mentoring, regular classroom observations, advisement and

14

evaluation. Significantly, these contracts could not be altered without the agreement of the candidate himself or herself.

These are exactly the kinds of regulations that give rise to constitutionally protected property rights, and defendants do not argue that plaintiff had no property interest in these contracts or the benefits conferred by them. It is clear beyond dispute that plaintiff had a legitimate expectation, based on these regulations, that the Board of Education would enter into and perform the contracts required by State law. That being the case, it is only a matter of logic that plaintiff's protected property interest extended to his participation in the Teaching Fellows Program, including his continued employment.

The State Department of Education regulations at issue go to the very heart of the employment relationship. As a preliminary matter, they require a school district to provide a written three year commitment of employment. 8 NYCRR 80-5.13(a)(2)(iii). This commitment was not for just any kind of employment, but employment that included the mentoring mandated by 8 NYCRR 52.21(b)(3)(xvii). The written mentoring agreements mandated under 52.21(b)(3)(xvii)(b)(3)(ii)(B) et seq. included specific details on how candidates were to be supervised, observed and evaluated, which differed from the rules applicable to probationary teachers on the traditional route to certification.[4]. Clearly then, Transitional b teachers (and hence, Teaching Fellows)

---

[4]     The rules for observation and evaluation of traditional route probationary teachers are contained in Article 8 of the collective bargaining agreement between the Board of Education and the United Federation of Teachers, available online at
http://www.uft.org/member/rights/contracts/current_teachers_contract/article_eight/. That contract refers to a document entitled "Teaching For the 21st Century," located online at
http://www.uft.org/leader/teaching_for_th/index.html. Access to that document, however, is apparently restricted to authorized users, of which the undersigned is not one. The same web site states that the UFT

have legitimate expectations, grounded in state law, that the Board of Education will keep its three year commitment and comply with the regulations applicable to that employment commitment, including the contracts mandated thereunder.

Simple logic compels the conclusion that a three year commitment of employment means exactly what it says, and the plain meaning of this regulation is enough to create a legitimate expectation that the employment will continue for the three years required by law, absent just cause to terminate it. Defendants' only argument to the contrary is that Education Law §2573 precludes any probationary teacher from claiming any due process rights with respect to his employment. As discussed above, however, the Board of Education regularly, either through regulations, by-laws, or collective bargaining agreements, imposes limitations on its ability to terminate transitional teachers "at any time."

Again, simple logic tell us that if the Board of Education can be compelled to adhere to the limitations on the termination of probationary teachers contained in the CBA and elsewhere, nothing prevents the Board of Education from promising to adhere to the three year commitment of employment which the State Department of Education regulations required as a condition for allowing the Board of Education to employ alternate route teachers under the Transitional B certificate. This is to say nothing more than that the New York courts require the Board of Education to adhere to the promises that it makes, whether by contract or by-laws. The Board promised to employ plaintiff for three years, and this is enough to give rise to a legitimate expectation of continued

---

contract requires probationary teachers to receive at least two formal observations per year. http://www.uft.org/member/rights/working/faq_olr/lessons/index.html.

employment on the part of the plaintiff. This expectation is firmly grounded in state law and is in no way a mere unilateral hope or desire.

As noted above, plaintiff's complaint does not merely address the termination of his employment, but his termination from the Teaching Fellows Program. This program provided more than employment to the plaintiff. It also provided full payment for his enrollment in a Master's Degree program, which would permit him to become a fully licensed, permanent teacher. See complaint, ¶17. When plaintiff was terminated, he was deprived of more than a job, but also of this extremely valuable benefit. Plaintiff clearly had a property interest in the full scholarship for his Master's Degree provided by the Teaching Fellows program. *Coleman v. Newburgh Enlarged City School District*, 319 F.Supp.2d 446 (S.D.N.Y. 2004)(holding that a college scholarship is a protected property interest). Similarly, the Board's underwriting the entire cost of plaintiff's Master's Degree makes his interest in continuing in the Teaching Fellows program analogous to the property interest of a student at a State University, which cannot be taken for disciplinary reasons without adequate due process safeguards. *Winnick v. Manning*, 460 F.2d 545 (2d Cir. 1972). *Cf. Garcia v. State University Of New York Health Sciences Center At Brooklyn*, 2000 WL 1469551 (E.D.N.Y. 2000)(recognizing plaintiff's property interest in his continued enrollment that could not be deprived without due process). The fact that plaintiff was attending Pace University, a private university, does not change anything. The operative fact is that plaintiff was enrolled in the Teaching Fellows program, which is entirely a creature of the Board of Education, which contracted separately with a number of local universities, public and private, to provide an education (and other services) to the Teaching Fellows in

17

accordance with state regulations and the specifications of the Teaching Fellows program. The particular university to which a teaching fellow was assigned was essentially random. See http://www.nycenet.edu/secretary/calendar/05-16-01/calendar.htm#3:

> As the Board's college and university partners, these institutions will provide pre-service training, in-service coursework, monthly faculty observations, and support services, to the alternate route candidates over approximately a two-year period. All of the institutions in the consortium have agreed to meet a common set of standards and to deliver the services for the same cost-efficient price.
>
> The proposed contract includes both pre-service training and related support activities, and the in-service component of the program, including tuition, student fees, monthly faculty observations, certificate processing, academic support services, and administrative fees. The cost is $12,000 per Alternative Certification candidate, based on a negotiated cost structure that reflects CUNY rates. The proposed contract amounts for each institution reflect their estimated capacity. In addition, the colleges will be reimbursed at negotiated rates for pre-approved coursework required of candidates over and above the regular Master's program. Teachers will be assigned to colleges according to the district in which they work. Upon the successful completion of the college program, it is expected that each Alternative Certification candidate will be awarded a Master's Degree in Education, and will be recommended to the New York State Department of Education for Provisional, Permanent or Initial Teacher Certification.

Since plaintiff had a property right in continuing his education, the Board could not deprive him of that right for disciplinary reasons without granting him a pre-deprivation hearing.

### 2. Defendants Misinterpret the Law Regarding Post Deprivation Remedies

18

Little space need be devoted to answering defendants' arguments regarding post deprivation remedies. Defendants have simply misinterpreted the law. As explained by the Second Circuit in *Hellenic American Neighborhood Action Committee v. New York*, 101 F.3d 877, 880 (2d Cir. 1996):

> When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post deprivation remedy. *When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of post deprivation procedures will not, ipso facto, satisfy due process.* (internal citations omitted, emphasis added)

Here, defendants simply conflate plaintiff's allegations of due process violations (i.e., the absence of a pre-deprivation hearing) with plaintiff's allegations that the school administrators lacked sufficient reasons for terminating his employment. This confusion is puzzling, since defendants correctly recognized on page 10 of the Memorandum of Law the distinction between the issues going to factual basis for plaintiff's termination and the issue of what process was due to him. By page 14 they have forgotten this principle and appear to be arguing that plaintiff's allegations regarding the reasons for his termination constitute allegations of "random, unauthorized acts" for which a post deprivation hearing would be a sufficient remedy. This is an incorrect reading of the complaint, the law, or both. The Second Circuit continued explanation in *Hellenic American Neighborhood Action Committee, supra* is instructive:

The Supreme Court's different treatment of the two situations rests on pragmatic considerations. When a deprivation occurs because of a random, arbitrary act by a state employee "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is ... almost ... [invariably] beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." (internal citations omitted)

It is plain that plaintiff's due process allegations in this case relate to actions taken by the defendants in the structured environment of established state procedures. It is ludicrous to suggest that defendants could not, as a practical matter, have provided a meaningful hearing before the deprivation. Indeed, defendants regularly provide such pre-deprivation hearings in the case of tenured teachers.[5]

### 3. Plaintiff's allegations against Levy are sufficient.

At this juncture, it would be premature to dismiss plaintiff's complaint against Levy. The complaint sufficient alleges that Levy knowingly and intentionally chose not to afford adequate due process procedures for the Teaching Fellows, notwithstanding his awareness that such procedures were constitutionally mandated. Nothing more is needed to state a cause of action against Levy in his personal capacity.

### 4. Defendants' Arguments regarding Supplemental Jurisdiction are mooted by the continued viability of his federal claims.

Since, as shown above, defendants' motion to dismiss plaintiff's federal claims should be denied, the Court need not address the question of exercising supplemental jurisdiction over plaintiff's state law claims.

---

[5]     Moreover, as noted above, the grievance and arbitration proceeding could not reinstate plaintiff to the Teaching Fellows Program, so it was clearly not an adequate post deprivation remedy in any sense of the word.

# Conclusion

Defendants' motion should be denied.

Dated: New York, New York
       December 31, 2004

MICHAEL G. O'NEILL
(MO3957)

Attorney for Plaintiff
30 Vesey Street, Third Floor
New York, New York 10007
(212) 581-0990