UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Clifford Steward, individually and on behalf of all similarly situated persons,

               Plaintiff,

          - against -

The City of New York, The New York City Board of Education, Harold O. Levy, individually and in his official capacity as Chancellor of the New York City Board of Education, Felix E. Vazquez, individually and in his official capacity as Community Superintendent of District 32 of the New York City Board of Education, Mildred L. Boyce, The United Federation of Teachers, and Pace University,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

]
]
]
]
]
]
] **04 CV 1508 (CBA)(RML)**
]
]
] **Plaintiff's Counter**
] **Statement Pursuant to**
] **Local Rule 56.1**
]
]
]
]
]
]
]

Plaintiff submits the following counterstatement of facts pursuant to Local Rule 56.1.

    1.      Plaintiff Clifford Steward ("plaintiff') commenced this action, alleging that the City of New York, the New York City Board of 'Education (the "Board"), former Chancellor Harold-Levy, (Collectively, "City defendants), former Superintendent Felix Vazquez and former Board employee Mildred Boyce, terminated plaintiff and, in so doing, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Exhibit 2 A.

    **Response**

    Agreed.

    2.      Plaintiff also asserts claims under New York State law. However, pursuant to the September 8, 2005 order of Hon. Carol B. Amon, United States District Judge, the parties were to

conduct limited discovery focusing on the nature of plaintiffs participation in the Teaching Fellows program, after which, City defendants were authorized to submit a summary judgment motion.

**Response**

Agreed.

3.     In 2001, plaintiff decided that he wanted to apply to the New York City Teaching Fellows Program (the "Teaching Fellows program"). See Exhibit C at p. 18.

**Response**

Agreed.

4.     The Teaching Fellows program is an alternative certification program whereby individuals in other careers or recent college graduates can begin their careers while pursuing the requisite Masters degree certification and appointment to a regular teaching position. Vicki Bernstein, the Board's Director of Alternative Certification, testified at her deposition that the purpose of the Teaching Fellows program. is to recruit potential teachers who may want to switch to teaching from other careers or recent college graduates who wish to teach.

**Response**

Defendants' offhand description of the Teaching Fellows Program is cursory and woefully incomplete.  The Teaching Fellows Program cannot be understood outside the context of the enabling regulations of the New York State Education Department ("SED").

In about 2000, in response to a shortage of new teachers being produced by the so-called "traditional route,[1]" the New York State Education Department ("SED") enacted regulations for so-called "alternative route" certification. 8 NY ADC 80-5.13 The alternative route certification regulations at issue in this case created the "transitional b" certificate. Id. The transitional b certificate is available to individuals who (a) meet certain minimum education requirements (essentially a bachelor's degree), (b) who are enrolled in an educational program leading to masters degree approved by the SED for transitional b purposes, (c) and who have a three year commitment of employment from a school district, with at least one year of "mentored teaching" as defined by the regulations. Id. The regulations are drafted in such a manner that the parties involved (the individual, the university and the school district) must effectively form a three way partnership, the terms of which are dictated by the regulations. Id. Hence, in order for its alternate certification education program to be approved by the SED, the university's program must include a mentored teaching component. 8 NY ADC 52.21. In order to receive the transitional b license, the individual must submit evidence of a commitment from a school district to provide the mentored teaching required by the regulations. 8 NY ADC 80-5.13(a)(2)(iii). These mentored teaching requirements are highly detailed and require the university and the school district to enter into written mentoring and support agreements with the individual. 8 NY ADC 52.21 Only when the university and school district agree to comply with these highly detailed and specific requirements does the SED grant a transitional b license to the individual to teach. 8 NY ADC 80-5.13(a)(2)(i)(b)(1).[2]

---

[1]     Under the traditional route, individuals enroll in an approved teacher preparation program in college. Typically prospective teachers are required to obtain their masters degree in education and pass certain exams before being licensed to teach in New York. *See* http://www.highered.nysed.gov/tcert/certificate/rightpathway.htm#1 .

[2]     For the Court's convenience, the regulations in question are annexed hereto as an appendix.

As drafted, the SED regulations leave it to the three parties to come together on their own to form the partnership described above, with the onus being on the individual, who is required to submit the application for the certificate.  In other words, the individual must locate and enroll (at his or her own expense) in a university offering an approved transitional b masters degree program, and then the individual must find a school district willing to hire him or her, and then, and only then, is the individual in a position to apply to the SED for the transitional b certificate.

The Teaching Fellows Program removes this onus from the individual and, instead, prepackages all the elements of the three way partnership.  Steward Declaration, ¶¶3-5.  The New York City Department of Education (The "Board")[3] has entered into a "Master Contract" with various local universities that offer masters degrees in programs approved by the SED for transitional b purposes.  O'Neill Declaration, ¶¶2-3, Exhibit A.  Under this Master Contract, the local universities agree to accept individuals designated by the Board (i.e., Teaching Fellows) into their programs and process, on behalf of the individual, all the paperwork required by the SED for the transitional b certificate.  Id.  Obviously, the Board itself supplies the three year teaching commitment.

There is an express quid pro quo between the Board and the Teaching Fellows.  In additional to the convenience of packaging together all the pieces of the transitional b requirements for the individual, the Board also agrees to pay for most of the cost of the university program, in effect promising the Teaching Fellows a subsidized masters degree in return for the Teaching Fellows' participation in the program.  Steward Declaration, ¶¶3-5.  In return, the Board extracts a promise from the Teaching Fellows to teach in the New York City school system for the duration of the program, and if a Teaching Fellow quits before fulfilling that commitment, the Teaching

---

[3]     The New York City Department of Education is the successor to the New York City Board of Education.  It will be referred to as the Board.

Fellow becomes liable for reimbursing the Board the cost of the masters degree program.  Id., Eichenholtz Declaration, Exhibit F.

It is beyond dispute that the relationship among the Teaching Fellows, the Board, the universities is contractual in nature.  Teaching Fellows are express, third party beneficiaries of the Master Contract, and, as defendants seem to recognize, there is an implied contract between the Teaching Fellows and the Board.  These contracts – the Master Contract and the implied contract between the Teaching Fellows and the Board – give rise to the property interests at stake in this lawsuit.

5.     Teaching Fellows are permitted to teach in the classroom while simultaneously pursuing a masters degree at a participating university. The Masters degree is subsidized by the Board, but the Board requires the participate to reimburse the Board should they withdraw from the Teaching Fellows program prior to successful completion. See Exhibit F.

**Response**

Teaching Fellows are *required* to teach in the classroom by SED regulations.  Otherwise, plaintiff agrees with the substance of this paragraph.  8 NY ADC 80-5.13; 8 NY ADC 52.21.

6.     The Board contracts with private universities to provide the Masters degree portion of the Teaching Fellows program. See Exhibit D at p. 57.

**Response**

Agreed.

7.     Ms. Bernstein testified that the Teaching Fellows Program begins in June. The participants receive preservice training and begin university coursework during that month. See Exhibit D at p. 45.

**Response**

Agreed.

8.     The first summer of the program, Teaching Fellows are assigned to summer school where they will be assisted and observed in teaching a class. Id.

**Response**

Agreed.

9.     Ms. Bernstein testified that at the beginning of the Fall semester, the Teaching Fellows participate in orientation and serve as teachers without assistance. At the same time, the Teaching Fellows continue with their university coursework. Id. at p. 46.

**Response**

Plaintiff agrees that Ms. Bernstein's testimony was roughly as summarized here.

10.     Ms. Bernstein testified that, generally, teaching fellows complete their Masters degree within approximately two years, at which point they are given a regular teaching appointment. See Exhibit D at p. 27, 48-49.

**Response**

Plaintiff agrees that Ms. Bernstein's testimony was roughly as summarized here.

11.     Ms. Bernstein testified that with respect to contractual rights for Teaching Fellows, there are no specific provisions of the Collective Bargaining Agreement dedicated to the Teaching Fellows. Rather, Teaching Fellows "fall under the same agreement as other teachers." See Exhibit D at p. 104. Ms. Bernstein testified that for employment practices such as discipline and termination "[Teaching Fellows] are like all other teachers in that regard." Id. p. 85.

**Response**

Plaintiff agrees that there are no provisions of the Collective Bargaining Agreement dedicated to the Teaching Fellows. Plaintiff agrees that Ms. Bernstein's interpretation of the Collective Bargaining Agreement appears to be the Board policy and reflects how the Board applies that policy, but plaintiff does not accept that interpretation as correct or binding upon plaintiff or this Court. Indeed, plaintiff's contention is that this policy violates his constitutional rights.

12.     Ms. Bernstein testified that the Board does not commit to employing teaching fellows for thee years. See Exhibit D at p. 79.

**Response**

Plaintiff agrees that Ms. Bernstein so testified. Plaintiff argues, however, that whether the Board implicitly commits to employing teaching fellows for three years is a question of fact for the jury to decide. Alternatively, it is a question of law for the Court. Steward Declaration, ¶¶3-5.

13.     Ms. Bernstein testified that the Board of Education has never been asked by the State of New York to give a commitment to employ teaching fellows for three years. Id.

**Response**

Plaintiff agrees that Ms. Bernstein so testified. Plaintiff notes that the SED regulations do not require the school district to submit anything to the SED, therefore there is no reason that the SED would request the Board to supply commitments. Under the SED regulations, the "candidate" (i.e., in the context of this case, the Teaching Fellow) is required to submit the commitment of employment. 8 NY ADC 80-5.13(a)(2)(i)(b)(1). Under the Master Contract, the contracting universities (in this case, Pace) agreed to submit to the SED the paperwork required by the SED

regulations, which necessarily includes the three year commitment. O'Neill Dec. ¶3-4, Exhibit A. Discovery obtained from the SED shows that the SED does not specifically require a written commitment of employment from the universities, but relies on the integrity of the universities which certify that individuals are eligible for the transitional b certificates. O'Neill Dec. ¶¶5-7, Exhibits B, C and D.

14.      Ruth Pagery, Supervisor of Teaching Education Programs for the New York State Department of Education, testified that the State of New York, which issues the Transitional B teaching certificate does not require teachers to submit evidence of a three year commitment of employment in order to obtain the certificate and that "none of the applicants [for transitional B certificates] have commitments f6r full time employment." See Exhibit E.

**Response**

Denied, Ms. Pagery used the word "applications" not "applicants" in her testimony. The full context of the testimony relied on by defendants, at pages 22 and 23 of Pagery's deposition, was as follows:

> Q.      Are you aware of any applicants who have submitted an application that did not have a commitment for full-time employment?
>
> A.      None of the applications have commitments for full-time employment. That's not part of the application.
>
> Q.      Well, it's part of the regulation, isn't it?
>
> A.      It appears to be.
>
> Q.      Well, are you aware of anybody who has applied for the certificate without meeting the commitment required by the regulation, even if it's not formally submitted, in other words, if the commitment is not shown to the State Education Department?

A.     No, I am not.

Thus, Pagery's testimony meant something quite different from that presented by

defendants.  Furthermore, Pagery gave the following testimony at page 20:

Q.     Based on your last answer, is it fair to say that when an institution of
higher education submits an application for a transitional b certificate, that the
applicant must be employed during the term of the academic program?

A.     That's correct.

See also response to paragraph 13 above.

15.     Plaintiff acknowledged that he never received any written guarantee of three

years' employment from the Board. See Exhibit C at pp. 100-101

**Response**

Agreed that it was not written and agreed that it was not a guarantee.  It was, however an

oral or implied agreement that plaintiff would remain employed provided that he performed

satisfactorily.  See Steward Declaration, ¶¶3-5.

16.     In 2001, following a series of group interviews, plaintiff was accepted into the

Teaching Fellows program. See Exhibit C at pp. 26,29.

**Response**

Agreed.

17.     On or about May 29, 2001, plaintiff signed a form entitled "Fellow

Commitment." See Exhibit C at p. 32; Exhibit F.

**Response**

Agreed.

18.     The Fellow Commitment stated that plaintiff must maintain "good standing" as, inter alia, "an employee of the Board of Education." See Exhibit F.

**Response**

Agreed.

19.     The Fellow Commitment form also stated that plaintiff must maintain professional conduct becoming of a student and a teacher." Id.

**Response**

Agreed.

20.     Ms. Bernstein testified that the purpose of the Fellow Commitment Form is to "outline the obligations of teaching fellows and to insure their concurrence and understanding of these obligations." See Exhibit D at p. 95.

**Response**

Plaintiff agrees that Ms. Bernstein's testimony was roughly as summarized here. Ms. Bernstein's testimony simply acknowledges that the relationship between the Teachings Fellows and the Board was contractual in nature. Herein is exposed the central fallacy of defendants' position. The obligations of the Teaching Fellows did not flow from their status as employees of the Board (other non-tenured teachers did not share these obligations and they are not contained within the Collective Bargaining Agreement. The obligations of the Teaching Fellows arose from the oral or implied agreement between the Board and the Teaching Fellows. This oral or implied agreement necessarily imposed obligations on the Board as well. These obligations were neither defined by the Collective Bargaining Agreement nor were they enforceable via its grievance and arbitration provisions. The contractual rights that accrued to plaintiff under this oral or implied

agreement ensured that he would not be expelled from the Teaching Fellows Program as long as he performed his obligations. Accordingly, under settled constitutional law, plaintiff had a protected property interest in his status as a Teaching Fellow, and that could not be terminated without a pre-deprivation hearing.

21.     At some point prior to September 4, 2001, plaintiff signed a document entitled Certificate-to-Serve as a Teaching Fellow

**Response**

Agreed.

22.     The "Certificate to Serve as a Teaching Fellow" provides that upon issuance of a Transitional B certificate from the State of New York, "you will be processed as a Certified Provisional Teacher (CPT)." See Exhibit G.

**Response**

The document speaks for itself. Defendants have offered no evidence (testimony, chancellor's regulations, etc.) relating to the meaning or significance of this certificate. Without a foundation, it is inadmissible. Plaintiff signed the certificate because he was instructed to do so. Steward Declaration ¶6.

23.     As plaintiff has acknowledged, a "Certified Provisional Teacher;" is a person who has not yet been appointed and who holds a New York State provisional or permanent certificate. See Exhibit H.

**Response**

Exhibit H is a letter of protest written by plaintiff in the course of his grievance procedure. Steward Declaration, ¶7. The term "Certified Provisional Teacher" is used in the Collective

Bargaining Agreement between the Board and the UFT. Plaintiff denies that he was a "Certified Provisional Teacher."

24.      A teacher who is not yet appointed but has a temporary license, but does not possess a New York State provisional certification is considered a "Preparatory Provisional Teacher." Unlike a Certified Provisional Teacher, a Preparatory Provisional Teacher must be renominated annually. Id.

**Response**

See response to paragraph 23. The term " Preparatory Provisional Teacher " is used in the Collective Bargaining Agreement between the Board and the UFT. Plaintiff denies that he was a " Preparatory Provisional Teacher."

25.      Plaintiff began the teaching fellows program in the Summer of 2001. See Exhibit C pp. 39-40.

**Response**

Agreed.

26.      Plaintiff was assigned to teach at I.S. 383. See Exhibit 1.

**Response**

Agreed.

27.      Plaintiff was assigned to Pace University for his Masters degree program and began taking classes at Pace before the beginning of summer school. See Exhibit C at pp. 40-41.

**Response**

Agreed.

28.     By the end of the summer of 2001, plaintiff had earned two to three credits toward his Masters degree. Id. at p. 42.

**Response**

Agreed.

29.     Plaintiff was also assigned in the summer of 2001 to be a "co-teacher" at I.S. 383 with an experienced teacher and taught the entire summer schedule with that teacher. Id. at p. 41.

**Response**

Agrees that he was so assigned and was in the classroom for the entire summer schedule.  In the context of the SED regulations, plaintiff's participation in the Teaching Fellows Program during the summer of 2001 was part of the "Introductory Component" of Pace's Alternative Teacher Certification Program.  In contrast, his experience as a teacher was part of the "In Service Component," which was supposed to include mentored teaching.  *See generally* 8 NY ADC 52.21(b)(3)(xvii).

30.     Plaintiffs "co-teacher" also served. as his mentor during the summer of 2001. See Exhibit C at p. 43.

**Response**

Admits that plaintiff testified, in response to questions exploring his understanding of the term "mentor," that the experienced teacher in question could be regarded as a mentor.  Plaintiff denies that plaintiff's experience with said teacher constituted mentored teaching as required by the SED regulations.  As noted above, the mentored teaching requirement related to the In Service Component of the Alternative Teacher Certification Program, while the summer classroom work was part of the Introductory Component.  One has nothing to do with the other.  Plaintiff was never

given mentored teaching as required by the regulations, and he was not assigned a mentor by the Board until either October or December, 2003. Steward Declaration, ¶8.

31.     Plaintiff also was provided, through Pace University, the opportunity to have group discussions with a senior teacher. Id. at p. 43.

**Response**

Agreed, although it is hardly material to the motion. See also Steward Declaration, ¶8. Pace's breach of its obligations is not at issue on this motion.

32.     For the Fall 2001 semester, plaintiff was assigned to teach five classes at I.S. 383. Id. at p. 57.

**Response**

Agreed.  Plaintiff was assigned these classes in contravention of 8 NY ADC 52.21(b)(3)(xvii)(3)(ii)(b), which provided:

> ***Prior*** to the candidate's employment as a teacher, the institution shall execute a written agreement with the employing school or school district ***by which the school or school district agrees to consult with program faculty and the candidate before determining the teaching load of the candidate***

[emphasis and bolding supplied]

33.     Plaintiff took two or three classes at Pace University in the Fall 2001 semester. See Exhibit C at p. 57.

**Response**

Agreed.

34.     Plaintiff was assigned a mentor at I.S. 383, Margaret Kirsch, in October 2001. Plaintiff was meet with Ms. Kirsch approximately two to three times a week. Id. at p. 58.

**Response**

Agreed.

35.     Ms. Kirsch was also approachable when plaintiff had questions or concerns. Id.

**Response**

Agreed.

36.     Plaintiff also continued to have group mentoring discussions with a senior teacher at Pace University about twice a week. Id. at p. 59.

**Response**

Agreed.

37.     In Fall 2001, plaintiff received an unsatisfactory classroom observation from the Principal of I.S. 383, and a marginally satisfactory classroom observation from the Assistant Principal. See Eichenholtz Decl., Exhibit J.

**Response**

Agreed.  Plaintiff further notes that the SED regulations required the Board of Education and Pace to enter into a first and a second written agreement with plaintiff setting forth, among other things, the schedule and plan for plaintiff and the school to engage in "planning, observation, advisement, and evaluation."  These written agreements were never entered into, and the observations by the school principal should never have taken place.  Steward Declaration, ¶8.  Instead, plaintiff should have been observed in accordance with the SED regulations.

38.     Plaintiff was also informed that, following a parent complaint, the principal of I.S. 383 determined that the his administration of an examination was unsatisfactory. See Exhibit C at p. 54; Exhibit J.

**Response**

Agreed, although plaintiff vigorously denies that his administration of an examination was unsatisfactory.  Steward Declaration ¶9.  This fact is, in any event, irrelevant to the issue of what process was due plaintiff before his termination.

39.     By letter dated January 18, 2002, plaintiff was informed that he was being terminated as a teacher at I.S. 383. See Exhibit J.

**Response**

Agreed.

40.     As set forth in the letter, the decision to terminate plaintiff was based upon an unsatisfactory and marginally satisfactory classroom evaluation, a letter to plaintiff s file concerning a failure to comply with a parent's request and an allegation of corporal punishment. See Exhibit J; Exhibit K.

**Response**

Agreed, although plaintiff vigorously denies that he engaged in any "corporal punishment." Steward Declaration, ¶¶10-12.  This fact is, in any event, irrelevant to the issue of what process was due plaintiff before his termination.

41.     The allegation of corporal punishment was deemed substantiated following an investigation by the Principal of I.S. 383. See Exhibit K.

**Response**

Agreed that the principal, who instituted the charge, "deemed" it substantiated. Plaintiff denies that the investigation of the principal was meaningful, impartial or in good faith. Steward Declaration, ¶¶11-12. This fact is, in any event, irrelevant to the issue of what process was due plaintiff before his termination.

42.     Plaintiff was given an "unsatisfactory" evaluation for his service during the period he worked at I.S. 383. See Exhibit J; Exhibit L.

**Response**

Agreed. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

43.     The Board of Education and the United Federation of Teachers has agreed to a grievance procedure for adjudicating disputes under the Collective Bargaining Agreement ("CBA") between those parties. See Exhibit M.

**Response**

Agreed. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

44.     At the advice of his union representative, plaintiff filed a grievance claiming his termination and letters to his file documents his supervisor's belief that his performance was unsatisfactory were improper and in violation of the CBA. See Exhibit C at p. 66; Exhibit N; Exhibit 0.

**Response**

Agreed. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

45.     Among the relief requested by the plaintiff was to have his termination reversed" and "the grievant reinstated and made whole." Id.

**Response**

Agreed.  This fact is, in any event, irrelevant to the issue of what process was due plaintiff before his termination.  Moreover, plaintiff could not be made whole by the grievance procedure. Steward Declaration, ¶13.

46.     The grievance procedure has three steps, the first step is adjudicated at the school level, the second step is adjudicated by the Superintendent's Officer and the third step is adjudicated by the Chancellor's representative. See Exhibit M.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

47.     Plaintiffs grievance was denied at Steps I and 11 by the Superintendent's Representative. See Exhibit N. Plaintiff appealed the Step 11 denial.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

48.     Following a hearing before Chancellor's Representative Richard W. Topp, plaintiff s grievance was denied at Step 111. See Exhibit 0.

**Response**

Agreed. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

49.     In support of this decision to deny the grievance, Chancellor's Representative Topp wrote "the grievant's employment could have 'been immediately terminated, without any advance notice, as there was a rational basis to support the administration's conclusions that the grievant had disobeyed directives of the principal and had committed corporal punishment ... Accordingly, the grievant discharge did not violate the, [CBA]." Id.

**Response**

Agreed that the document so states. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

50.     After a grievance is denied at Step III by the Chancellor's Representative, the union may opt to take the grievance to arbitration. See, Exhibit M; Exhibit P.

**Response**

Agreed. This fact is irrelevant to the issue of what process was due plaintiff before his termination.

51.     At arbitration, the grievance is adjudicated by a neutral arbitrator selected by the Board and the UFT pursuant to the voluntary labor arbitration rules of the American Arbitration Association. See Exhibit P.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

52.        The union agreed to appeal the Chancellor's Representative determination to an arbitrator. See Exhibit C at pp. 79-80.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

53.        However, plaintiff had disagreements with his union concerning their strategy at the arbitration.  Plaintiff testified at his deposition that he arrived for his arbitration proceeding, but left after he decided that his union was not "honoring" the teaching fellows program by disagreeing with plaintiffs view that he should be fully reinstated with back pay. See Exhibit C at pp. 94, 97.

**Response**

Denied.  It is absurd to assert that the plaintiff had a disagreement with the UFT over "strategy."  Plaintiff's written statement, Exhibit H to the Eichenholtz declaration, states plaintiff's position concerning his arbitration.  Plaintiff did not proceed with the arbitration because the Union had advised plaintiff that the only remedy that the arbitrator could provide was to force the Board to pay plaintiff the remainder of his salary for his first year of teaching.  The arbitrator could not reinstate plaintiff to the Teaching Fellows Program, and, of course, without his license, plaintiff could not obtain employment as a teacher anywhere.  Steward Declaration, ¶13.

54.        Plaintiff elected not to proceed with his arbitration after he had spoken with Michael O'Neill, the attorney for plaintiff herein. See Exhibit C at p. I 10.

**Response**

Agreed only in the sense that plaintiff had consulted with his attorney before the scheduled date of the arbitration.  Plaintiff's counsel was not present at the arbitration.

55.      In addition to filing a grievance to challenge his termination, plaintiff also filed a request for a review of his "Unsatisfactory" rating. See Exhibit Q; Exhibit R.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

56.      Non-tenured pedagogical teachers., such as the plaintiff herein, are entitled to a review of an unsatisfactory evaluation. The review, conducted pursuant to Board Bylaws, allows the teacher to cross-examine the rating officer and to submit evidence in support of his or her contentions that the unsatisfactory rating is inappropriate. A Committee Chairperson, selected by the Chancellor, presides over the proceedings and makes an advisory report to the Chancellor. The Chancellor then renders a final decision, either sustaining or reversing the rating. See

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.  Furthermore, the "review" amounts to nothing more than an appeal to the Chancellor's discretion.  There are no legal standards governing the Chancellor's exercise of his discretion and his decision is non-reviewable.  The process is illusory as a post deprivation remedy, because it amounts to nothing more than the Chancellor deciding whether to exercise his authority to countermand actions taken by his or her subordinates, which the Chancellor is free to do at any time.

57.     On May 3, 2002 The Office of Appeals and Review received a "Waiver" form concerning plaintiff from the United Federation of Teachers. See Exhibit S.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

58.     The purpose of this waiver form is to allow for the postponement of plaintiff s review pending the outcome of a grievance. See Exhibit S.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

59.     The waiver specifically provides:

YOU ARE REQUIRED TO NOTIFY THE OFFICE OF APPEALS AND REVIEWS IMMEDIATELY, WHEN THE REASON FOR THE WAIVER NO LONGER EXISTS IN ORDER TO HAVE A REVIEW SCHEDULED. FAILURE TO NOTIFY THE OFFICE OF APPEALS AND REVIEWS THAT REASON FOR THE WAIVER HAS BEEN COMPLETED WILL RESULT IN YOUR CASE BEING CLOSED.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his termination.

60.     The Office of Appeals and Review never received any further communications from Clifford Steward, either directly or through his union, after receiving his executed waiver from the LJFT. Accordingly, plaintiff s file maintained for plaintiff s appeal of his unsatisfactory rating was closed in August 2005. See Exhibit S ~8.

**Response**

Agreed.  This fact is irrelevant to the issue of what process was due plaintiff before his

termination.

61.        On or about April 8, 2004, plaintiff filed his Complaint in the instant action. See

Exhibit A.

**Response**

Agreed.

Dated: New York, New York
        January 29, 2007

                                MICHAEL G. O'NEILL
                                (MO3957)


                                _____
                                Attorney for Plaintiff
                                30 Vesey Street, Third Floor
                                New York, New York 10007
                                (212) 581-0990